United States Court of Appeals,

Fifth Circuit.

No. 94-40240.

In the Matter of LAMAR HADDOX CONTRACTOR, INC., Debtor.

ORIX CREDIT ALLIANCE, INC., f/k/a Credit Alliance Corp., Appellant,

v.

James Allen HARVEY, Jr., Estate Representative, on Behalf of Lamar Haddox Contractor, Appellee.

Dec. 20, 1994.

Appeal from the United States District Court for the Western District of Louisiana.

Before JONES and STEWART, Circuit Judges, and DUPLANTIER,[*] District Judge.

DUPLANTIER, District Judge:

In this adversary proceeding, the bankruptcy court concluded that three payments made by Lamar Haddox Contractor, Inc. ("Debtor") to the adversary proceeding defendant, Orix Credit Alliance, Inc. ("Credit Alliance"), a non-insider creditor, over five months before the Debtor filed for bankruptcy were voidable preferences. 11 U.S.C. §§ 547(b), 550(a)(1) (1993).[1] The bankruptcy court entered judgment in favor of the estate representative plaintiff and against appellant Credit Alliance for the total amount of the three payments. Credit Alliance appealed to the district court, which affirmed the bankruptcy court's

---

[*]District Judge for the Eastern District of Louisiana, sitting by designation.

[1]11 U.S.C. § 550(a) was amended in October, 1994.

1

judgment.  Because the estate representative failed to prove that the Debtor was insolvent at the time the payments were made to Credit Alliance, we REVERSE.

During the year preceding the Debtor's filing for bankruptcy, the Debtor, a construction company, made a series of payments on four promissory notes held by Credit Alliance;  these notes were secured by mortgages of construction equipment owned by the Debtor. Lamar Haddox, the president and founder of the Debtor, personally guaranteed all four notes;  his brother, Douglas, personally guaranteed three of them.

The bankruptcy petition was filed on April 13, 1989.  At the beginning of the preceding year, the Debtor owed Credit Alliance over $1,100,000.  During that year, the Debtor made the following payments to Credit Alliance:

| Payment Date | Payment Amount |
| --- | --- |
| 4/29/88 | 5,806.69 |
| 4/29/88 | 11,000.49 |
| 6/ 7/88 | 2,889.00 |
| 7/ 1/88 | 25,658.00 |
| 7/20/88 | 31,222.97 |
| 9/27/88 | 30,971.00 |
| 9/30/88 | 30,971.00 |
| 11/ 3/88 | 30,728.00 |
| Total | $169,247.15 |

These payments reduced the balance owed on the notes to $942,363.17.  The Debtor continued operating its business in

Louisiana and Arkansas until December 20, 1988, when it shut down its Arkansas operations "for the winter." On February 24, 1989, the Debtor sold the equipment securing the notes to a non-related third party for $826,780.00, which sum was paid to Credit Alliance. Credit Alliance financed the sale, forgave the Debtor the $115,583.17 deficiency, and released the Haddox brothers from their personal guarantees. On April 13, 1989, the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Reform Act (the "Bankruptcy Code").

James Allen Harvey, Jr., as estate representative, instituted this adversary proceeding to recover from Credit Alliance the amount of the above-listed payments made to Credit Alliance during the year preceding the bankruptcy filing.[2] After trial on the merits, the bankruptcy court held that the three payments made on and after September 27, 1988 were voidable preferences under the Bankruptcy Code. The court concluded that the Debtor became insolvent on September 27, 1988, that the payments were not made in the ordinary course of business, and that the transfers to the non-insider creditor occurred within a year of the filing for bankruptcy and benefitted insider creditors, 11 U.S.C. §§ 550, 557; *Southmark Corp. v. Southmark Personal Storage, Inc.,* 993 F.2d 117 (5th Cir.1993); *Levit v. Ingersoll Rand Fin. Corp.* (*In re V.N. Deprizio Constr. Co.*), 874 F.2d 1186 (7th Cir.1989) (transfer to non-insider creditor occurring within a year of the filing for

___

[2]There was no attempt to avoid the payment of the proceeds from the sale of the collateral securing the notes.

3

bankruptcy may be avoided as preferential when the transfer benefitted an insider creditor). The bankruptcy court entered judgment in favor of the plaintiff estate representative in the amount of $92,670.18, the total of the last three payments to Credit Alliance. The district court affirmed the judgment.

Credit Alliance contends that the judgment of the bankruptcy court, as affirmed by the district court, should be reversed on several grounds. *Inter alia,* Credit Alliance argues that *Deprizio* was incorrectly decided, that *Southmark*'s approval of *Deprizio* is dictum not binding upon us, and that the 1994 amendment to Section 550 of the Bankruptcy Code, Section 202 of the Bankruptcy Amendments of 1994, Pub.L. 103-394, 108 Stat. 4106 (1994), which rejected the *Deprizio* line of cases, effected no change but instead made explicit what was always the proper interpretation of the statute. We consider none of those issues nor other grounds for reversal urged by appellant, because we agree with appellant's contention that the estate representative failed to prove that the Debtor was insolvent at the time of the allegedly preferential transfers.

We must accept the bankruptcy court's findings of fact unless they are clearly erroneous. *Wilson v. First Nat'l Bank* (*In re Missionary Baptist Found. of Am., Inc.*), 796 F.2d 752, 756 (5th Cir.1986). A finding of fact is clearly erroneous when " "although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been committed.' " *Id.* at 756 (citation omitted). The bankruptcy

court's determination that the Debtor was insolvent at the time of the three allegedly preferential transfers is a finding of fact subject to the clearly erroneous standard of review. *Clay v. Traders Bank of Kansas City,* 708 F.2d 1347, 1350 (8th Cir.1983). Mindful that "[s]trict application of the clearly-erroneous rule is "particularly important where, as here, the district court has affirmed the bankruptcy judge's findings,' " *Wilson,* 796 F.2d at 755 (citation omitted), in reviewing the record we are nevertheless left with the definite and firm conviction that the bankruptcy court committed a mistake when it concluded that the Debtor was insolvent on the dates of the payments to Credit Alliance.

The estate representative may avoid a transfer of property as a preference if the estate representative establishes that such transfer was made:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made

    (A) on or within 90 days before the date of the filing of the petition;  or

    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider;  and

(5) that enables such creditor to receive more than such creditor would receive if

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made;  and

    (C) such creditor received payment of such debt to the

extent provided by the provisions of this title. 11 U.S.C. §§ 547(b), (g) (1993). To avoid a transfer as preferential, the plaintiff must prove that the Debtor was insolvent at the time the allegedly preferential transfer occurred. 11 U.S.C. § 547(b)(3). There is a presumption of insolvency for the ninety days preceding the filing of bankruptcy, but that presumption is not applicable to this case because the allegedly preferential payments were made over five months before the Debtor filed for bankruptcy. 11 U.S.C. § 547(f). Thus, the plaintiff estate representative has the burden of proving insolvency by a preponderance of evidence, without the benefit of a presumption.

A corporate debtor is insolvent when its "financial condition [is] such that the sum of [its] debts is greater than all of [its] property, at a fair valuation...." 11 U.S.C. § 101(32)(A). Courts often refer to this test as a balance sheet test, and then engage in the "fair valuation" of the debts and property shown on the balance sheet, as required by the statute. *See, e.g., In re Taxman Clothing Co., Inc.,* 905 F.2d 166, 169-70 (7th Cir.1990). Needless to say, a fair valuation may not be equivalent to the values assigned on a balance sheet. Financial statements reflect the book value of assets, ordinarily the cost of the property reduced by accumulated depreciation. The rate of depreciation is usually the maximum allowed by income tax regulations. The fair value of property is not determined by asking how fast or by how much it has been depreciated on the corporate books, but by "estimating what the debtor's assets would realize if sold in a prudent manner in

current market conditions." *Pembroke Dev. Corp. v. Commonwealth Sav. & Loan Ass'n,* 124 B.R. 398, 402 (Bankr.S.D.Fl.1991) (holding that a transfer was not voidable because of the lack of any evidence, such as appraisals or opinion testimony, of the actual value of real properties).

Plaintiff sought to establish that the Debtor was insolvent at the time of the allegedly preferential transfers solely through the testimony of Milton Kelley, a certified public accountant who had prepared the Debtor's tax returns and financial statements since 1976. However, Mr. Kelley's testimony established only that as of September 30, 1988, the date on which the Debtor's fiscal year ended, the company's preliminary unaudited financial statements and its general ledger showed an excess of liabilities over assets (a deficit equity position) of $216,000. He testified that the company had suffered a loss of over $2,000,000 during its preceding fiscal year and that such loss had reduced the company's positive equity position of $1,787,000 on September 30, 1987 to a deficit equity position of $216,000 on September 30, 1988. Based on the large operating loss and the resulting balance sheet deficit equity position, he concluded that the Debtor was "probably bankrupt" on September 30, 1988.

The estate representative presented no evidence whatsoever of the fair value of the Debtor's property. The accountant testified that he had no information as to the fair value of the equipment: "I don't know what the appraised value would be of fixed assets, but if they were worth more than the value on the books" the

company could be solvent.  He could not determine whether the fair value was greater than the book value because there are "so many factors:  how long, you know, how well it's maintained, what the market is for it."

There is evidence that the book value of the assets probably was not reflective of the property's fair value.  The bulk of the Debtor's assets consisted of heavy equipment, much of which was over ten years old, substantially depreciated on the corporate books.[3]  If the fair value of the equipment exceeded the book value of the equipment by more than $216,000, the Debtor was solvent when the allegedly preferential payments were made.  There was neither testimony nor a financial record from which a court could determine what either the book value or the fair value of the equipment was on September 30, 1988.

While the Debtor's insolvency does not have to be established through documentary evidence, *see Porter v. Yukon Nat'l Bank,* 866 F.2d 355, 356-57 (10th Cir.1989) (stating that insolvency does not have to be proved by a "thoughtful, well-documented analysis of Debtor's assets and liabilities"), such evidence would have helped the court to determine the fair market value of the assets.  The estate representative's counsel declined to introduce such evidence, even though the accountant offered the 1988 unaudited

---

[3]Because no financial statements were introduced into evidence, neither the rate nor the amount of depreciation can be determined.

8

financial statements and the general ledger to the court.[4]  As a result, the court was left with only conclusory opinion testimony as to insolvency, without any evidence necessary to support the conclusions.

The opinion testimony was not sufficient to establish the debtor's insolvency, because substantial questions remain as to the fair value of the Debtor's property.  No witness had any information as to the fair value of the property, only its book value.  Much of the equipment which constituted a large percentage of the corporate assets was over ten years old and therefore substantially depreciated on the corporate books.  There was no evidence as to the extent of that depreciation on the critical dates.  Therefore, we must conclude that the courts below were clearly erroneous in finding that the estate representative had carried the burden of proof that the Debtor was insolvent on and after September 27, 1988, an essential element of his claim that the payments to appellant were preferential transfers.

The district court's judgment in favor of the plaintiff, James Allen Harvey, Jr., estate representative, is REVERSED and the case

---

[4]Q (by plaintiff's counsel):  "And can you give us, narrow a time period as to the beginning of insolvency?"

A (by accountant):  "No.  As I said, I don't get any interim financial statements so I don't have any figures at any period during that year.  It just goes from October 1st of "87 through 9/30 of "88.  I have the financial statements and the general ledger with me.  It might show better what I got."

(By plaintiff's counsel):  "At this time we're not going to need you to introduce those."

is REMANDED with instructions to enter judgment for Credit Alliance.

**REVERSED AND REMANDED.**